## UNITED STATES

### v.

### Bernard GOLDFINE.

### Crim. No. 1158–58.

United States District Court

District of Columbia

June 24, 1959.

Oliver Gasch, U. S. Atty., William Hitz, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Edward Bennett Williams, Thomas A. Wadden, Washington, D. C., for defendant.

MORRIS, District Judge.

The defendant is under indictment for contempt of Congress, charged with refusing to answer, when testifying before it, questions pertinent to the inquiry being made by the Special Subcommittee on Legislative Oversight (hereinafter referred to as "the subcommittee"), of the Committee on Interstate and Foreign Commerce of the United States House of Representatives, authorized by Public Law 601, Sections 121(b) (1) (k) and 136, 79th Congress (60 Stat. 826–827, 832), and House Resolutions 5, 99, 197 and 316, 85th Congress.

The case is before the Court on defendant's motion for return and suppression of evidence. At the argument on the motion, it was insisted that the unanswered questions which gave rise to the indictment were framed from information illegally gained by the subcommittee's chief investigator by eavesdropping, through a locked door connecting the hotel suite occupied by the defendant and his family and an adjacent hotel room occupied by a friend and alleged accomplice of the investigator, both with the naked ear and by use of an electronic microphone, loudspeaker and recording device. Early in such hearing, government counsel stated he could, if so ordered by the Court, "show by testimony

of witnesses, largely supported by documentary evidence" that the subcommittee was in possession of information sufficient to frame the unanswered questions almost a month prior to the incident giving rise to the alleged illegally gained information. Thinking this method of proceeding might be helpful and obviate the need for further testimony, it was ordered by the Court, and the hearing was continued to the following Monday. When the hearing was resumed, counsel for defendant argued that, even if the subcommittee had the information necessary to the framing of the questions prior to the alleged eavesdropping incident, there had been an intrusion into the attorney-client relationship, as conferences were held in the hotel suite in question between the defendant and his several counsel during the time (the week-end of June 29–30, 1958) of the eavesdropping, and that such intrusion, under the doctrine of Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749, and Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879, the proceedings before the subcommittee were vitiated to the extent that this defendant could not be prosecuted for contempt because of his refusal to answer the questions, thereby amending the motion, in the alternative, for a motion to dismiss.

The very voluminous testimony revealed that the subcommittee's then chief investigator, Baron Ignatius Shacklette, and his friend, a news reporter, with the help of the then cashier of the hotel obtained the room adjacent to the defendant's suite on the week-end in question, and others during the following week and week-end, which they considered advantageous for their alleged purpose of learning whether the defendant and his staff were engaged in "espionage" efforts directed at the members of the subcommittee; that, on the week-end in question, they overheard "snatches" of conversations, both by the naked ear when standing at the connecting door between their room and the defendant's suite and by listening over the loudspeaker of a recording machine,

for which purpose they had placed a microphone near the connecting door, between the members of defendant's family and between the defendant and his counsel. They insisted they heard nothing of any consequence, and that no recordings were made. No evidence was introduced to contradict that of the subcommittee's chairman and chief counsel and of Shacklette that the latter undertook this venture without the knowledge or authority of the subcommittee, and that no information gained thereby was ever reported to the subcommittee or any of its members.

It was urged by the defendant that he has a constitutional right to counsel in the proceedings before the subcommittee, a right just as sacred as that appertaining to an indicted person in a criminal proceeding; and that, if such is not so, he has an equally sacred and protected right by reason of the House of Representatives Rule XI (k) (l), contained in House Resolution 151, adopted March 23, 1955, which provides:

"(k) Witnesses at investigative hearings may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights.

"(l) The chairman may punish breaches of order and decorum, and of professional ethics on the part of counsel, by censure and exclusion from the hearings; and the committee may cite the offender to the House for contempt."

The case of Anonymous Nos. 6 and 7 v. Baker, 79 S.Ct. 1157, while dealing with witnesses summoned in a state judicial inquiry into alleged improper practices at the local bar, wherein it was contended the refusal to permit their counsel to be present at the hearing violated the Fourteenth Amendment to the Federal Constitution, would seem to put at rest any claim to a constitutional right to counsel in the proceedings before a Congressional Committee. There is no question, however, that, in the proceedings out of which the contempt charges grew, the defendant did have counsel which were

recognized by the subcommittee, and the right to such counsel was in no way abridged by any alleged misconduct on the part of such counsel. It is clear that the alleged improper eavedropping occurred prior to the testimony of the defendant before the subcommittee, but it seems equally clear to the Court that the right to the advice of counsel, recognized by the Rule of the House above alluded to, contemplates the right of consultation between the defendant and his counsel in preparation of his testimony at the hearing without any interference or intrusion by the subcommittee, or by any one authorized by it. There can be no question, from the evidence taken on the motion under consideration, that Shacklette undertook the eavesdropping above mentioned. There is no substantial evidence that any privileged communication was overheard, and there is positive evidence on the part of Shacklette and of the chairman and the chief counsel of the subcommittee that absolutely nothing as to anything overheard in such attempted eavesdropping was reported or brought to the knowledge or attention of the subcommittee. The evidence further shows that, although Shacklette retained the title and pay of chief investigator of the subcommittee, he had been stripped of much of his authority as such, and had no authority to eavesdrop or make use of any electronic device to learn of any communications between the defendant and his counsel. The use of any electronic device had been specifically denounced by the subcommittee following certain incidents substantially prior and unrelated to the matters here under consideration. The chairman had been vested by the subcommittee with the sole authority of directing the activities of Shacklette and the other members of its staff.

The subcommittee's chairman testified, and this is substantiated by Shacklette's letter of resignation and his testimony at an executive session of the subcommittee on Monday, July 7, 1958 (called by the chairman after the early-morning incident at the hotel when Shacklette and his news reporter friend were discovered eavesdropping, in a manner similar to that employed on the occasion here involved, on a press conference held by the defendant's public relations staff, and stated by the chairman to be his and the subcommittee members' first knowledge of such activities by Shacklette) that Shacklette had not had any assignment to or connection with the Goldfine investigation, except when, shortly before the hearings commenced, he had been directed by the chief counsel to determine whether there was any supporting information with regard to reports that the defendant had registered at the hotel under an assumed name and that Mr. Hagerty had lunched or dined with him at the hotel, and when, prior to the dismissal of the former chief counsel, he had purchased a ticket to go to Boston on the Goldfine investigation, which trip was cancelled by reason of such dismissal. The chairman further testified that rumors were persistent that the home and official telephones of the subcommittee members were being tapped; that some of the members became concerned about such rumors, some of whom advised him Shacklette had been to see them and that he had some information about it; that on Tuesday, July 1st, certain of the members, Shacklette and he were together in his office; that Shacklette said he had information that a member of a New York investigating firm, which had a reputation for tapping telephones, was operating in Virginia, and that he had a friend who could take a device and determine if the telephones were tapped; that he and the other members present then arranged for Shacklette to obtain the services of his friend, and for them to go to the home of one of such members, who resided in Virginia, one of the other members also deciding to be present at such time. The chairman testified that Shacklette called at his office and advised, as had the two subcommittee members, that the investigation to discover wire taps had revealed that there were none, and further that he had no positive information respect-

ing the operation of the New York investigator in Virginia, or whether he had any connection with the rumored investigation of the subcommittee members; that at such time Shacklette indicated his desire to "get in on the Goldfine investigation," to which the chairman replied, "No," that he was not assigned to that case; that Shacklette then said he could go to the hotel and get a room across from the defendant's secretary, where he could observe people coming and going, and that he had a contact and could get a microfilming machine for microfilming papers which could be procured during the secretary's absence to attend the subcommittee hearings; that he (the chairman) admonished him not to do this and to stay away from the hotel, stating that the subcommittee would not allow it, and that he would also get himself into difficulty. It seems to be Shacklette who concluded that the matter of the tapping of the subcommittee members' telephones was a Goldfine matter. Indeed the transcript of the testimony before the executive meeting of the subcommittee (pp. 25–27) shows that Shacklette had engaged in the critical eavesdropping prior to any discussion with the chairman and other members of the rumors concerning such tapping of telephones, and even before he there stated he had such knowledge of said rumors. It thus becomes clear that he used this assignment to "cover" for his previous unauthorized activities, and would seem to substantiate the chairman's testimony concerning Shacklette's desire to be assigned to the case.

It is charged in an affidavit of counsel in support of the motion that the room occupied by the defendant's secretary had been ransacked and certain papers and documents relating to the subject matter of defendant's testimony before the subcommittee were removed therefrom. There is testimony by an investigator, a member of the bar of this Court, and the person who went with Shacklette to determine the existence or nonexistence of taps on the telephone wires in the home of one of the subcommittee members,

that Shacklette called him on the telephone at his home on July 4th, and "wanted to know if I could recommend a locksmith that could get some luggage open for him," and later, when he asked whether he was able to work out all right on his suggestion that he get as many luggage keys from as many friends as possible, and he would probably be able to get them open, that Shacklette had replied, "No, the contact got an employee of the hotel to move the luggage in a larger piece of luggage and we accomplished our purpose." This witness further testified that Shacklette had invited him on July 6th to the room he was occupying in the hotel, and that Shacklette showed him the closet in the room (the witness stating that he recalled a hanging light and also a light in the ceiling) and pointed to the light and the size of the closet and said, "It made an excellent place for operating a portable photostat machine, and he had used it for that purpose." This witness stated that at a later date Shacklette came to him for professional legal advice, and claimed a privilege respecting their conversations thereafter, which claim was never ruled on by the Court, as counsel veered away from questions which involved the claim. Shacklette was not recalled to refute these incriminating statements, but, when testifying prior thereto, he vehemently denied he had operated any kind of reproducing machine while in that room, or that he had knowingly had in his possession any documents or papers which had been removed from the rooms of the defendant, or any of his staff. It seems unnecessary for the Court to make a finding as to whether Shacklette did obtain illegal possession of such papers, and, if so, whether he made reproductions of them, as there is absolutely no evidence in the case to the effect that any such reproductions, or any information relating thereto, were delivered to the subcommittee or any of its members. On the contrary, there is credible evidence that this was not done.

It is insisted by the defendant that the fact that there was no communication to

the subcommittee or any of its members only goes to the question of prejudice, and he relies on the holding in the Coplon case, supra [89 U.S.App.D.C. 113, 191 F.2d 759], that the Fifth and Sixth Amendments to the Constitution "unqualifiedly guard the right to assistance of counsel, without making the vindication of the right depend upon whether its denial resulted in demonstrable prejudice." In that case the defendant alleged in a motion for a new trial in this jurisdiction that she had discovered for the first time at a subsequent hearing in New York that her telephone wires at her home and office in Washington and at her home in Brooklyn had been tapped by F.B.I. agents prior to, during and subsequent to her trial here. Our Court of Appeals set aside the order of this Court denying the motion for a new trial and remanded the case for a hearing to determine whether the alleged interceptions actually occurred, in which event, a new trial was also ordered. The following is also an excerpt from the Coplon case (89 U.S.App.D.C., at page 113, 191 F.2d at page 759):

"We consider it equally true that a defendant and his lawyer have a right to talk together by telephone without their conversations being monitored *by the prosecution* through a secret mechanical device which they do not know is being used. It would not be an answer to say that the accused cannot complain of the interception of his telephone conversations with his counsel if he had on other occasions ample personal consultation with his lawyer, face to face, which no person overheard. That fact would not erase the blot of unconstitutionality from the act of intercepting other consultations. [Emphasis supplied.]

The defendant also insists that the subcommittee is bound by and responsible for Shacklette's acts whether or not it knew of or consented to them under (1) agency law, and (2) the doctrines of due process and civil rights cases. Consideration had been given to all the cases cited in this respect, and I am of the opinion that they are inapplicable to the factual circumstances of the instant case. On the contrary, I cannot see how a subcommittee, or any other arm of government, can be so thwarted in its efforts to carry out its work by the completely unauthorized and unknown illegal activities of one of its employees, the fruits of which were not even communicated to it. See Cooper v. Denno, D.C.S.D.N.Y.1955, 129 F.Supp. 123, affirmed 221 F.2d 626, certiorari denied 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289, and Krull v. United States, 5 Cir., 1957, United States ex rel. Cooper v. Denno, 240 F.2d 122, certiorari denied 353 U.S. 915, 77 S.Ct. 764, 1 L.Ed.2d 668.

It is certainly understandable that the defendant should complain of and be indignant at the intrusion upon his conversations with his counsel in the manner revealed at the hearing, and it may well be that such should be considered in mitigation of any punishment which would be visited upon him if convicted of the charges in the indictment. But he cannot thereby wholly escape the consequences of his refusal to answer pertinent questions propounded by the subcommittee in its authorized inquiry into facts necessary for proper legislation. His refusal to answer the questions involved was upon the ground that they were not pertinent, and proof of this is the burden he must face.

The motion will be denied. Counsel will prepare an appropriate order carrying this decision into effect.