**UNITED STATES of America ex rel.
Elmer BURKE, Relator,**

v.

**Wilfred L. DENNO, as Warden of Sing
Sing State Prison, Respondent.**

United States District Court
S. D. New York.

Feb. 9, 1957.

Maurice Edelbaum, New York City, for relator.

Louis L. Lefkowitz, Atty. Gen., of the State of New York, for respondent Warden of Sing Sing State Prison, Michael Freyberg, Deputy Asst. Atty. Gen., Albert P. Loening, Jr., Asst. Dist. Atty., New York City, of counsel.

SUGARMAN, District Judge.

Upon the petition of one of the counsel assigned to defend him in the state court, the relator, Elmer Burke, moves that the respondent, Warden of Sing Sing State Prison, the Attorney General of the State of New York, and the District Attorney of New York County show cause "why a writ of habeas corpus should not be issued herein, directing the production of the relator, Elmer Burke, before this Court, so that the cause of his detention and imprisonment may be inquired into."

The petitioner claims that the relator is unlawfully detained by the respond-

ent in Sing Sing Prison in Ossining, New York, awaiting execution of a sentence of death pronounced upon him by the Court of General Sessions of the County of New York, upon relator's conviction of the crime of murder in the first degree. After reciting the procedural history of this case, the petition asserts in substance that relator was denied a fair trial in accordance with the standards of the due process guaranteed by the Constitution of the United States on three grounds: first, the trial court's denial of an adjournment or a change of venue because of prejudicial newspaper publicity; second, the refusal of the court to set aside the verdict because of allegedly prejudicial security measures in the courtroom; third, the court's denial, during the trial, of a motion for a mistrial made after certain cross-examination of the defendant by the prosecuting attorney.

Each of these questions was raised on the appeal by the relator to the New York Court of Appeals from his conviction in General Sessions. In disposing of those issues, among others, that Court affirmed the conviction stating: "Judgment of conviction affirmed; no opinion." [1] Certiorari was denied by the Supreme Court.[2]

■■ When a district judge sits as scrutator of the judgment of the highest court of a state, he does so as the Congressional designee "in the hierarchy of the federal judiciary to express the higher law" and not as "a lower court sitting in judgment on a higher court." [3] In the performance of this compulsory review "in habeas corpus cases, as in others, denial of certiorari cannot be interpreted as an 'expression of opinion on the merits.' " [4] Hence, denial of certiorari to the New York Court of Appeals in this case is accepted as merely a step in the required exhaustion by relator of his state court remedies.[5]

■ The relator having had the representation of able and industrious assigned counsel throughout the proceedings and an adequate record having been made available to this court, no hearing is deemed necessary.[6]

While an explanatory opinion by the New York Court of Appeals might have shed some light on the reasons for the affirmance, the record and briefs on appeal to that Court amply demonstrate that the questions of due process under the Constitution of the United States now raised, were there squarely presented and "due account of the [state court] proceedings that are challenged by the application for a writ" [7] is taken.

### I.

#### The Motions for a Change of Venue or an Adjournment

Twice in the Court of General Sessions (once by formal motion and again at the trial prior to the selection of the jury) the relator moved for a change of venue or an adjournment of the trial because of an article which appeared in a metropolitan daily evening newspaper three days before the formal motion and eight days before the commencement of the trial. The initial motion was brought on by the affidavit of one of re-

1. People of State of New York v. Burke, 1956, 1 N.Y.2d 876, 154 N.Y.S.2d 637, 136 N.E.2d 711.

2. Burke v. People of State of New York, 1956, 352 U.S. 931, 77 S.Ct. 233, 1 L.Ed. 2d 166.

3. Brown v. Allen, 1952, 344 U.S. 443, at page 510, 73 S.Ct. 397, at page 448, 97 L.Ed. 469, opinion of Mr. Justice Frankfurter.

4. Brown v. Allen, note 3 supra, 344 U.S. at page 497, 73 S.Ct. at page 441.

5. 28 U.S.C.A. § 2254; Sheppard v. State of Ohio, 1956, 352 U.S. 910, 77 S.Ct. 118, 1 L.Ed.2d 119.

6. Brown v. Allen, note 3 supra, 344 U.S. at page 505, 73 S.Ct. at page 445; Cooper v. Denno, D.C.S.D.N.Y.1955, 129 F. Supp. 123, affirmed 2 Cir., 1955, 221 F. 2d 626, certiorari denied 1955, 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289.

7. Brown v. Allen, n. 3 supra, 344 U.S. at page 500, 73 S.Ct. at page 443.

lator's assigned counsel, to which was annexed an exhibit of the second section of the Brooklyn edition of the "New York World-Telegram and The Sun," which was fairly characterized in that moving affidavit as an article which dealt with a story about this defendant; mentioned much about the impending trial; mentioned the death of others and that the police were seeking the body of this defendant's former friend and painted this defendant as a multiple murderer and blackguard. The affidavit asserted also that the article in question revived earlier publicity which occurred at the time of relator's arrest some months before, which, but for the later article, "may have died down." However there was no proof that the later article, published in the Brooklyn edition of the newspaper, was distributed in New York County where the trial was held and, if so, produced the atmosphere of hostility that would have made a fair and impartial trial in New York County an impossibility.

The jury to which the indictment was tried was a special jury [8] which by statute is required to consist of only those persons who are able "to lay aside an opinion or impression formed from newspaper reading or otherwise, [and] to render an impartial verdict upon the evidence, uninfluenced by any such opinion or impression * * *."

The offending article appeared, not during relator's trial but eight days prior thereto in one metropolitan evening daily apparently (in the absence of proof to the contrary) distributed in a county and borough of New York City from which none of the jurors who tried relator could have been drawn. In most cases the offensive article appears during the trial when its effect on the jury can no longer be tested and the court must be content with the admonition to the jury to ignore it.[9]

▆ There is nothing in the record to sustain the relator's counsel's assertion in his affidavit on the motion for change of venue or adjournment of the trial, that the article in question and the publicity which attended the relator's arrest "months ago" and which "may have died down * * * created * * * a very hostile attitude in the community against him." The bare statement alone is insufficient.[10]

Turning thence to the assertion in the same affidavit that a fair trial was then impossible because "[e]ach prospective juror must have seen these published articles or some person may have discussed such news reports with him" the record belies the claim. The examination of jurors on their voir dire has been said to be the best test as to whether local prejudice exists.[11] The interrogation of each prospective juror on the voir dire in criminal trials in New York state courts is not normally made part of the printed record on appeal. It was not in this case. This court directed the District Attorney of New York County to supply the minutes of the examination of each juror and alternate juror ulti-

---

8. New York Judiciary Law, McKinney's Consol.Laws, c. 30, § 749-aa, subd. 2.

9. Cf. United States v. Leviton, 2 Cir., 1951, 193 F.2d 848, at page 857, where it was said "Trial by newspaper may be unfortunate, but it is not new and, unless the court accepts the standard judicial hypothesis that cautioning instructions are effective, criminal trials in the large metropolitan centers may well prove impossible. United States v. Keegan, * * * 2 Cir., 141 F.2d [248] at page 258," certiorari denied 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350; Allen v. United States, 7 Cir., 1924, 4 F.2d 688, certiorari denied sub nom. Hunter v. United States, 1924, 267 U.S. 597, 45 S. Ct. 352, 69 L.Ed. 806; Mullen v. United States, 1924, 267 U.S. 598, 45 S.Ct. 353, 69 L.Ed. 806; Johnson v. United States, 1924, 268 U.S. 689, 45 S.Ct. 509, 69 L.Ed. 1158.

10. Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, certiorari denied 1948, 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773.

11. 22 C.J.S., Criminal Law, § 196; United States v. Eisler, D.C.1947, 75 F.Supp. 634.

mately accepted and sworn. That transcript shows that full opportunity was accorded to and exercised by relator to obtain by a searching inquiry a jury composed of talesmen who had either never read the article or, if they had, recalled having given it only scant notice. Every juror and alternate sworn was declared to be acceptable to the relator.*

---
*

| Juror | Relator's counsel's interrogation and acceptance |
|---|---|
| 1 Bloch | "Q. Now, have you read anything about this case prior to your coming here today? A. No, I was trying to think, I don't think I read anything of it.<br>"Q. You haven't read anything about it. A. I don't think so.<br>"Q. Now, you heard — A. But the name is familiar to me.<br>"Q. The name is familiar? A. Is familiar. But I had no connection—but I never took note of anything with that particular name.<br>"Q. And you heard the questions I asked the other juror? A. Yes.<br>"Q. Did I speak loud enough so that you could hear me? A. Oh, yes.<br>"Q. And you heard every question I asked. A. Yes.<br>"Q. Then you know, Mr. Block, about the background of my client. A. That's correct.<br>"Q. That I have been assigned, together with my colleagues, to defend. A. That's correct.<br>"Q. Do you feel that you could sit in this case, Mr. Block, and judge this case on the witnesses and the facts that are adduced in this courtroom only? A. That's right.<br>"Q. You feel that, sir. A. Yes, sir.<br>    *  *  *  *  *  *  *  *  *  *<br>"Acceptable to the defense." |
| 2 Cassidy | "Q. And in this case have you ever read anything about it, Mr. Cassidy? A. I did not.<br>"Q. At all? A. Not at all.<br>"Q. If you should recall that you did read something about it, do you believe that you could divest your mind of anything that you have ever read about it? A. Yes.<br>"Q. Do you feel, Mr. Cassidy, that you could try this case on the evidence in this case and this case alone? A. I do.<br>    *  *  *  *  *  *  *  *  *  *<br>"The juror is satisfactory to the defense." |
| 3 Prendergast | "Q. Now have you read anything in the paper about this case? A. I just saw the name in the headlines. I read nothing about it whatever.<br>"Q. Have you heard anything on the radio? A. No.<br>"Q. Seen anything in the movies? A. No.<br>"Q. Well, if you remember anything about the case, will you forget about what you remember? A. Yes. Actually I remember nothing about it, except the name.<br>"Q. And you feel that if you recall something during this trial, that you could divest your mind of what you had read? A. Oh, yes.<br>"Q. And apply solely the facts that are adduced here in this courtroom to this case. A. That's right.<br>    *  *  *  *  *  *  *  *  *  *<br>"The juror is satisfactory to the defense." |
| 4 Simon | "Acceptable to the defendant." |

Thus, the relator was tried by a fair and impartial jury[12] to which the court stated in its charge, without any exception having been taken thereto, that "nothing outside of that evidence [verbal testimony and exhibits] should be considered by you in your deliberations."

The record herein fails by far to establish that clear showing of abuse by the Court of General Sessions in denying the motions for change of venue or adjournment of the trial which would warrant a disturbance of the verdict by habeas corpus.[13]

| Juror | Relator's counsel's interrogation and acceptance |
|---|---|
| 5 Sutherland | "Q. Now, have you read anything about this case, Mr. Sutherland? A. I believe I have a vague recollection of having read something, but I remember no details.<br>"Q. Has it left any impression upon you? A. None whatever.<br>"Q. Such that you could not sit as a fair and impartial juror in this case? A. No reason at all.<br>    *   *   *   *   *   *   *   *   *   *<br>"Acceptable to the defense." |
| 6 Wade | "Q. Have you read anything about this case, sir? A. Headline, probably about six months ago or so.<br>"Q. Has it left any impression on you that would preclude you from sitting as a fair and impartial juror in this case? A. Not a thing.<br>"Q. Not at all. A. Not a thing.<br>    *   *   *   *   *   *   *   *   *   *<br>"Acceptable to the defense." |
| 7 Nelson | "Q. Have you read anything about this case? A. About three years ago, but I don't recall very much about it.<br>"Q. Has it left any impression? A. None at all.<br>"Q. To the extent where you would be prejudiced one way or another? A. None at all.<br>    *   *   *   *   *   *   *   *   *   *<br>"Acceptable to the defendant." |
| 8 Ansink<br>9 East<br>10 Small<br>11 Nelson<br>12 Brodie | "Acceptable to the defendant."<br>"Satisfactory to the defense."<br>"Satisfactory."<br>"Acceptable to the defense."<br>"Q. Have you read anything about this case, sir? A. It seems to me I did, but it's left a very vague impression on me.<br>"Q. Has it in any way affected your judgment in this case? A. No, I am sure it hasn't.<br>"Q. You will listen to the evidence. A. I would.<br>"Q. You will try the defendant Elmer Burke on the evidence in this case? A. I would.<br>"Q. And you won't try him on his past record. A. No, I certainly wouldn't.<br>"Q. I have that promise from you. A. Definitely.<br>    *   *   *   *   *   *   *   *   *   *<br>"Acceptable to the defense." |
| Alt. Wallis<br>Alt. Webster | "Acceptable to the defense."<br>"Acceptable to the defendant, your Honor." |

12. Lias v. United States, 4 Cir., 1931, 51 F.2d 215, affirmed 1931, 284 U.S. 584, 52 S.Ct. 128, 76 L.Ed. 505; Allen v. United States, note 9, supra.

13. United States v. Moran, 2 Cir., 1956, 236 F.2d 361, certiorari denied 1956, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed.2d 118; United States v. Allied Stevedoring Corp., 2 Cir., 1957, 241 F.2d 925, "Points XII and XIII", decided February 4, 1957.

## II.

### The Alleged Prejudicial Security Measures in the Courtroom

The petition in support of this application for a writ of habeas corpus states that:

> "Prior to the sentence, a motion was made by counsel for the relator to vacate the verdict of the jury on the ground that the trial had been conducted in an atmosphere which prevented the defendant from obtaining a fair trial. In was pointed out to the Court that no spectator was admitted to the courtroom during the trial, which lasted for about twenty days, unless he was searched and frisked manually by the Court attendants attached to the Court. In addition thereto, spectators were kept to one side of the courtroom, and on the other side of the courtroom a great many detectives in plain clothes were permitted to be seated in a section immediately behind the defendant. Counsel for the relator offered to submit proof that during the conduct of the trial jurors entering the corridor leading to the jury room were in a position to see, and did see the spectators being searched as they entered the courtroom. The motion was denied, as was the application for a hearing to offer proof with respect to the allegations by counsel, as above set forth."

That statement by counsel fairly summarizes what occurred on the day of sentence.

The court was trying a 38 year old defendant who, in his testimony, admitted (1) that he left high school at age 17 because he

> "was talking to a teacher and I made a mistake in grammar. I don't know what it was at the time, but I remember he says, 'You speak like you were brought up in the gutter,' and I got mad and wanted to fight. He run down the hall and I run after him, you know, and we ran into the disciplinarian's office, and some monitors grabbed me and the disciplinarian told me to go outside until I cooled off, * * * "

(2) that when he was 24 years old he was "arrested for armed robbery * *, * took a plea to robbery two * * * and (served) about two and a half years" in Elmira; (3) that while in the Army he was (a) "given * * * a summary court martial" in France and (b) was fined "for breaking a window in City Hall and for fighting with the (police) officers" in Kentucky; (4) that subsequently, after returning to civilian life, he "took a plea to robbery * * * three" and "got five to ten years in State's Prison, in Sing Sing"; (5) that (before the homicide for which he was being tried) he "had loaned * * * a .32 calibre Belgian automatic * * * to a friend * * * to commit a crime";

(6) that (after the homicide for which he was being tried) he (a) went to Boston, Massachusetts, where he was imprisoned for crime, (b) escaped from jail with the aid of some people, one of whom was armed and masked and (c) fled Massachusetts and went ultimately to South Carolina, where he was apprehended and returned to New York to stand trial.

It is difficult to understand how the knowledge of the jurors (assuming them to have had it) that (a) spectators at the trial were "searched and frisked manually by the Court attendants * * * (and) were kept to one side of the courtroom" and (b) "a great many detectives in plain clothes were permitted to be seated in a section immediately behind the defendant" denied relator "fairness [that] fatally infected the trial."[14]

In the light of relator's admissions at the trial, of acts demonstrating his propensity to refuse to yield to constituted authority (excluding the crimes in civil-

---

14. Lisenba v. People of State of California, 1941, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166.

ian and military life which he attributed to "black-outs" induced by intoxication and limiting it solely to his earliest intractability as a high school student and his latest jail-break with armed assistance) the security measures adopted by the state were not unreasonable [15] and could not be held to have reduced his trial to a farce.[16]

■ This court rejects the People's contention that because relator elected to stand mute throughout the entire trial (as to the practices which he first condemned after conviction and at sentence) and chose not to timely voice a complaint which would have put the trial court on notice and have afforded it an opportunity to correct or ameliorate the alleged abuses if it deemed them such, his mere silence constituted a waiver.[17] We do not have here the deliberate, unequivocal, articulate surrender of guaranteed rights sometimes permitted by rule or statute.[18]

■ The security measures adopted at the trial and the court's refusal to hold a hearing thereon did not deprive relator of due process.

15. McDonald v. United States, 8 Cir., 1937, 89 F.2d 128, 136, certiorari denied 1937, 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352; Cwach v. United States, 8 Cir., 1954, 212 F.2d 520, 527.

16. Odell v. Hudspeth, 10 Cir., 1951, 189 F.2d 300, certiorari denied 1951, 342 U.S. 873, 72 S.Ct. 116, 96 L.Ed. 656; De Wolf v. Waters, 10 Cir., 1953, 205 F.2d 234, certiorari denied 1953, 346 U.S. 837, 74 S.Ct. 56, 98 L.Ed. 358.

17. Cancemi v. People, 1858, 18 N.Y. 128.

18. Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268.

** "Q. Do you recall moving out on May 4, 1954 and moving to Folly Beach to enjoy the summer breezes? A. I refuse to answer.
"Q. How much was the rent at that bungalow in Folly Beach? A. Gee, I don't know. I really don't know. I don't know.
"Q. It was $180 a month, wasn't it? A. Yes, that's right.
"Q. That's correct. A. Yes, sir.

## III.
### The Alleged Prejudicial Cross-Examination of Relator

The "World-Telegram and Sun" article referred to in I supra contained among others two paragraphs as follows:

"Feud Flares.

"The long smoldering feud between Cribbins and Burke flared up at the Lake Ronkonkoma rendezvous. Cribbins was slain and his body hidden somewhere in the neighborhood, detectives were informed.

"Police believe Burke later murdered Connelly and his wife after he hid out with them on the Isle of Pines, a South Carolina resort. The FBI combed the Carolinas in an unsuccessful search for the Connellys' graves."

When relator was being cross-examined by the district attorney certain questions were asked.**

"Q. You weren't working, were you? A. No, sir.
"Q. Somebody was giving you that money. A. Yes, sir.
"Q. Somebody in South Carolina? A. I refuse to answer.
"Q. Do you have any rich uncles? A. Not that I know of.
"Q. Nobody who sends you $180 a month rent, at least. A. No. I was only there one month, from what I understand, from what I can recall.
"Q. Well, speaking about that month, who paid the $180 for that one month? A. I paid it.
"Q. And where did you get the money? A. Friends of mine.
"Q. In South Carolina? A. I refuse to answer.
"Q. In South Carolina did you meet a man named Duke Connelly? A. I refuse to answer.
"Q. And the Connelly I refer to was accompanied by his wife and two children. A. I refuse to answer.
"Q. I show you this photograph or snapshot and ask you to look at it. Do you see it? A. Yes, sir.

"Q. Do you recognize any of the people there? A. I refuse to answer.

"Q. Is one of the persons in that picture Duke Connelly? A. I refuse to answer.

"Q. Is the other one Mrs. Connelly? A. I refuse to answer.

"Q. Are the two other persons there their children? A. I refuse to answer.

"Mr. Herman: I ask your Honor, it be marked for identification.

"The Court: Mark it for identification.

(Snapshot marked People's Exhibit 22 for identification.)

"Q. What happened to Duke Connelly and his wife, do you know? A. I refuse to answer.

"Q. Well, let me ask you this question: Do you know what happened to Duke Connelly and his wife? A. I refuse to answer.

"Q. Do you know whether they are alive or dead? A. I refuse to answer.

"Q. Did you see them? A. I refuse to answer.

"Q. Well, I haven't finished my question. A. Oh!

"Q. Did you ever see them in your life A. I saw a photograph. I refuse to answer.

"Q. I am not talking about pictures. Did you ever see them in the flesh? A. I refuse to answer.

"Q. Did you ever see them in South Carolina? A. I refuse to answer.

"Q. Did they share that bungalow where you were arrested? A. Nobody shared that bungalow. I lived there alone.

"Q. Did you ever live with Duke Connelly, his wife and two children? A. I refuse to answer.

"Q. Did those two children call you 'Uncle Ranka'? A. I refuse to answer.

"Q. Do you know the Duke Connelly I inquire about? A. Oh, the F.B.I. showed me pictures.

"Q. And before you were shown pictures by the F.B.I. had you ever seen Duke Connelly? A. I refuse to answer.

"Q. And is that the same Duke Connelly who, with others, stuck up a bank in Queens? A. I don't know, sir.

"Q. Early in '54, I believe. A. I don't know, sir.

"Q. You don't know those things. A. No.

"Q. But didn't Connelly give you money? A. Refuse to answer.

"Q. Is Connelly still alive? A. Refuse to answer.

"Q. Do you know? A. I refuse to answer.

"Q. Did you know a couple with two children who used the name of Mr. and Mrs. Thomas Connelly? A. I refuse to answer.

"Q. Aren't they the same persons whose right names are Connelly? A. I refuse to answer.

"Q. Did you ever own an automobile? A. No, sir.

"Q. In South Carolina? A. No, sir.

"Q. Did Connelly have an automobile? A. I refuse to answer.

"Q. An Oldsmobile. A. I refuse to answer.

"Q. Did you ride around in it? A. Refuse to answer.

"Q. When you were arrested, did you not have a receipt for the parking or storage of a car in your pocket? A. I believe they found it in my pocket.

"Q. And under what circumstances did you have it in your pocket? A. It was in my pocket.

"Q. Yes. How did it get there? A. Someone gave it to me.

"Q. Who gave it to you? A. I am not going to tell you.

"Q. You didn't find that parking card in an alley, did you? A. Somebody gave it to me. I couldn't have found it there.

"Q. But you won't tell us who. A. No, sir.

"Q. But do you know who gave it to you? A. Yes.

"Q. Was that Duke Connelly, also known as Kelly? A. Refuse to answer.

"Q. Is he dead now? A. I refuse to answer.

"Q. Do you know where he is buried? A. I refuse to answer.

"Q. Do you know where Mrs. Connelly or Mrs. Kelly is buried? A. I refuse to answer.

"Q. Do you know what happened to those two kids? A. I refuse to answer.

"Q. Now, you testified yesterday, or you said yesterday, that you refuse to implicate your friends. A. Yes, sir.

"Q. Were the Connellys friends of yours? A. Refuse to answer.

"Q. If they are dead, how can you possibly implicate them?

"Mr. Edelbaum: Now, if your Honor please, I object to that statement. There is no proof here whatsoever that they are dead or alive.

"The Court: That's right. Sustained.

"Mr. Edelbaum: And in view of that question, I move for the withdrawal of a juror, and in view of the line of questioning, I move for the withdrawing of a juror and the declaration of a mistrial.

"The Court: Motion denied.

"Mr. Edelbaum: Respectfully except.

"The Court: The motion is denied. The jury will disregard the question and draw no inference from it whatsoever."

Relator contends that the quoted cross-examination, coupled with the article, warranted the mistrial sought and that its denial deprived him of due process.

From what appears in I *supra* the association in the jurors' minds of the Connelly mentioned in the article with the Connelly mentioned in the cross-examination is highly speculative. At most the cross-examination is to be gauged solely by its effect at the trial. That the cross-examination, by itself, implied that relator killed the Connellys is not farfetched. But New York holds that short of abuse such cross-examination is proper.[19]

"As to the 'due process of law' that is required by the 14th Amendment, it is perfectly well settled that a criminal prosecution in the courts of a state, based upon a law not in itself repugnant to the Federal Constitution, and conducted according to the settled course of judicial proceedings as established by the law of the state, so long as it includes notice and a hearing, or an opportunity to be heard, before a court of competent jurisdiction, according to established modes of procedure, is 'due process' in the constitutional sense. * * *

"It is therefore conceded by counsel for appellant that, in the present case, *we may not review irregularities or erroneous rulings upon the trial, however serious,* and that the writ of habeas corpus will lie only in case the judgment under which the prisoner is detained is shown to be absolutely void for want of jurisdiction in the court that pronounced it * * *." (Emphasis supplied).[20]

■ Thus, the determination of the relevance, in a trial for murder, of questions implying defendant's attempt to commit a disconnected but similar act, is within the state's power and the adoption of a rule permitting such interrogation does not violate the Fourteenth Amendment.[21]

The character of the cross-examination as inoffensive to due process was not altered by the district attorney's summation. The passages thereof which relator singles out and asserts, when coupled with the cross-examination, denied him due process, were fair argument in the light of the contested theories of the trial: i. e., that of the People, that the killing was deliberate and that of the defendant that it was not.

■ In any event, relator cannot now be heard to complain, having taken no exception to the portions of the summation which he now denounces.[22]

■ The denial of a motion for a mistrial because of the alleged prejudicial cross-examination of relator by the district attorney and the latter's summation was not a deprivation of due process.

The shibboleth in testing accordance of due process in state court criminal trials was stated by Justice Holmes to be

"In so delicate a matter as interrupting the regular administration of the criminal law of the State by this kind of attack too much discretion cannot be use, and it must be realized that it can be done only upon definitely and narrowly limited grounds." [23]

Justice Cardozo cautioned that

19. People v. Sorge, 1950, 301 N.Y. 198, 200, 93 N.E.2d 637, 638, where Fuld, J., cites three memorandum decisions of the New York Court of Appeals each of a "murder prosecution, [where] defendant [was] interrogated as to another murder."

20. Frank v. Mangum, 1915, 237 U.S. 309, 326, 35 S.Ct. 582, 586, 59 L.Ed. 969.

21. Lisenba v. People of State of California, note 14 supra.

22. United States v. Walker, 2 Cir., 1951, 190 F.2d 481, certiorari denied 1951, 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653.

23. Ashe v. United States ex rel. Valotta, 1926, 270 U.S. 424, 46 S.Ct. 333, 334, 70 L.Ed. 662.

"There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free." [24]

The application for a writ of habeas corpus is denied.

■ Where human life is at stake one may not indulge in the assumption that appellate tribunals will share his views of the law. Hence a certificate of probable cause is granted.[25]

It is so ordered.

---

24. Snyder v. Commonwealth of Massachusetts, 1934, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674; cf. Adamson v. People of State of California, 1947, 332 U.S. 46, at page 68, 67 S.Ct. 1672, at page 1683, 91 L.Ed. 1903, concurring opinion of Justice Frankfurter, "The fact that judges among themselves may differ whether in a particular case a trial offends accepted notions of justice is not disproof that general rather than idiosyncratic standards are applied. An important safeguard against such merely individual judgment is an alert deference to the judgment of the State court under review."

25. 28 U.S.C.A. § 2253; Fed.Rules Civ. Proc. rule 81(a), 28 U.S.C.A.