THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CALMAN COOPER, HARRY A. STEIN and NATHAN WISSNER, Appellants.

Reargued May 19, 1954; decided June 4, 1954.

*Nathan Kestnbaum* for appellants. I. The court below entirely misconceived and misinterpreted both the law and the facts. (*Matter of Fusco* v. *Moses,* 304 N. Y. 424; *Coplon* v. *United States,* 191 F. 2d 749, 342 U. S. 926.) II. An intrusion, whether by force or deceit, into the private consultation between attorney and client constitutes a denial of the right to counsel. (*Coplon* v. *United States,* 191 F. 2d 749; *Powell* v. *Alabama,* 287 U. S. 45; *People* v. *McLaughlin,* 291 N. Y. 480; *People* v. *Snyder,* 297 N. Y. 81.)

*Samuel Faile, District Attorney* (*John J. O'Brien* of counsel), for respondent. I. Appellants failed to establish that their right to counsel and to a fair trial were interfered with and impaired at any time during their trial. (*Bojinoff* v. *People,* 299 N. Y. 145; *People* v. *Richetti,* 302 N. Y. 290; *People* v. *Oddo,* 283 App. Div. 497.) II. Positive evidence in the record establishes that Rubin did not attempt to overhear conversations between appellants and their counsel and that no one directed Rubin to attempt to overhear such conservations.

FULD, J. On this reargument of the appeal, we are called upon to decide whether the judgments convicting defendants of murder in the first degree should be reversed on the strength of the charges made by defendants in support of an application for *coram nobis.*

Defendants were tried and convicted in the County Court of Westchester County in December of 1950, and the resulting judgments were affirmed by this court (303 N. Y. 856) and by the United States Supreme Court (346 U. S. 156). Thereafter, defendants applied in the county court for an order, in the nature of a writ of error *coram nobis,* vacating and setting aside the judgments of conviction on three separate grounds: first, that their right to counsel and to a fair trial was impaired; second, that the district attorney used evidence known by him to be perjured; and, third, that he suppressed material evidence. The county judge denied the application without granting defendants a hearing.

Defendants thereupon sought this court's consideration of that determination; they took an appeal from the order denying *coram nobis* and moved this court for reargument of their previous appeal on the basis of the facts alleged in the *coram*

*nobis* application. We dismissed the appeal from the county court's order on jurisdictional grounds, but granted the motion for reargument (306 N. Y. 678).[1] Upon such reargument, we ruled that, while the papers themselves revealed a manifest lack of merit insofar as the two specifications relating to the use of perjured testimony and the suppression of material evidence were concerned, issues of fact were raised with respect to the other specification and the county court should have held a hearing thereon " to determine whether defendants' right to counsel and a fair trial was interfered with and impaired " (306 N. Y. 867, 868).

As to that matter, it was defendants' claim that a police officer, Harry Rubin by name, was stationed in the courtroom — a few feet from the counsel table at which they were sitting — to listen to and report conversations between them and their several lawyers. The purpose, as well as the result, it was alleged, was to enable the officer " to overhear private and privileged discussions and consultations amongst attorneys and clients ". The People denied the charges, it being their claim that Rubin had been assigned to the courtroom simply and solely for security purposes and that, in any event, he had not heard anything that was said. Despite those denials, despite the absence of any allegation that the district attorney or his assistants knew about Rubin and despite the lack of any recital that he had conveyed any information to anyone, we decided that the papers created issues of fact, as to why he was posted in the courtroom and as to what he did there, entitling defendants to an opportunity to show that their rights had been infringed. Accordingly, we directed the county court to hold a hearing upon that specification.

That hearing has now been held, but little has been added to the record previously before us. Defendants called Rubin to the stand — but asked him nothing designed to reveal either the reason for his presence in court or his actions while there — and two other witnesses who cast no light on the issues we considered material. Be that as it may, though, we now have

---

1. By chapter 806 of the Laws of 1954, sections 517 and 520 of the Code of Criminal Procedure were amended — effective September 1, 1954 — to permit a defendant to take a direct appeal to this court from an order of the trial court, made in a capital case, denying a motion for a writ of error *coram nobis*.

before us the oral testimony of those three witnesses and, as a result of a stipulation between the parties, the affidavits upon which the *coram nobis* application was grounded. And, from that record, the following facts are to be distilled.

For the first part of the trial, which began on November 1, 1950, the three defendants and their lawyers sat at the counsel table approximately seven feet from a so-called spectators' box. Three deputy sheriffs sat immediately behind the accused, and others were stationed about the courtroom, most, if not all, of them in uniform. To avoid being overheard by their guards, defendants and their attorneys spoke in Yiddish, though in tones that probably carried some " three or four or five feet ". Beginning on December 15, 1950, and for the five remaining days of the trial, Rubin sat in the corner of the box closest to the table, which had, by then, been moved three feet closer to the box — to within four feet of it. A deputy sheriff told defendant Cooper not to lean over in speaking to one of his lawyers, which resulted in Cooper's speaking in " a louder tone of voice " than he would otherwise have used, and another deputy, when asked who the man in the box (Rubin) was, replied that he was a reporter. And, although during his service with the county parkway police Rubin had always appeared in uniform, for the five days he was in the courtroom he wore street garb, without a badge or other mark indicating that he was a law enforcement officer, and carried no gun. It further appeared that Rubin understood Yiddish, and that he was the only individual on the parkway police force who did.

That, however, was as far as the proofs went. Defendants failed utterly to show that Rubin was planted to listen in on or report conversations between defendants and their lawyers. True, there is an assertion in an affidavit by one of defendants' lawyers that Rubin had told him that he was " instructed * * * ' to listen ' " to what was said, and an article in the *Reader's Digest* for March, 1951, relates that, after Rubin took his place in the box, " the detective was listening to everything the defendants said to each other " (p. 140),[2] but such hearsay,

2. It was this article that first alerted defendants' counsel to the possibility of subterfuge and impropriety. Its highly romantic flavor, however, as well as the failure of the author even to indicate the source of his information, renders it of slight evidentiary value.

if it survived Rubin's actual testimony to the contrary, certainly was entitled to little, if any, weight. In point of fact, defendants did not even ask Rubin what his instructions or directions were when sent to the courtroom, and they refrained from taking the opportunity, afforded by the hearing, of calling as witnesses Rubin's superior, who was responsible for his assignment, the district attorney in charge of the prosecution, his two assistants or any of a number of others who might have been able to furnish information concerning Rubin's presence in court. And, beyond that, not only was there no showing that he overheard anything discussed between defendants and their counsel, but he averred in his affidavit, and repeated at the hearing, that he " heard nothing."

The affidavits of various public officials associated with the trial that Rubin was placed in the courtroom for good reason and in good faith are wholly uncontradicted. Those affidavits disclose that, on December 13, 1950, a deputy sheriff overheard part of a conversation in jail, in Yiddish, between defendants Cooper and Stein — previously convicted, we note, of serious crimes of violence, such as murder in the second degree and first degree robbery — which suggested to the deputy that they might attempt an escape from the courthouse during one of the luncheon recesses. He immediately made a written report to the under-sheriff in charge of the courtroom, and on December 15 Rubin was assigned to duty in the courtroom, in order " to assist   *   *   *   with the security measures being taken during the trial." Rubin swears that he overheard nothing whatsoever that was said at or around the counsel table and the district attorney and his assistants not only deny that they received any information from Rubin or anyone else as to conversations among defendants or between defendants and their lawyers, but they assert that they did not even know about Rubin or his presence in court.

The inference is almost inescapable that it was the report of defendants' escape-plan conversation that brought Rubin into the courtroom. Although he remained there for five days — December 15, 18, 19, 20 and 21 — on only two of them (December 18 and 19) were witnesses called and testimony given, the other days being taken up with the summations and the court's

instructions. That strongly substantiates the People's claim that Rubin was in court for security reasons and goes far, in and of itself, toward refuting defendants' charge that he was there to poach on lawyer-client confidences. Had the People desired or intended to discover what was said between defendants and their attorneys, reason suggests that they would have planted someone in court long before December 15, six weeks after the trial began, a day when no testimony was taken and when but a few hours of testimony remained before the trial closed. Nor is it likely, unless Rubin was in the spectators' box simply to help prevent an escape, that he would have remained for the summations and the court's charge to the jury.

The right to counsel, based on fundamental principles of justice, is inherent in the concept of a fair trial (see, e.g., *People* v. *McLaughlin*, 291 N. Y. 480, 482; *Williams* v. *Kaiser*, 323 U. S. 471, 473), and included therein, of course, is the right to consult counsel in private, without fear or danger that the People, in a criminal prosecution, will have access to what has been said, either openly, by forcing the attorney to divulge what he has learned, or secretly, by the use of a concealed recording device or the planting of a human eavesdropper. (See *Matter of Fusco* v. *Moses*, 304 N. Y. 424; *Coplon* v. *United States*, 191 F. 2d 749, certiorari denied 342 U. S. 926.) Intrusion upon a client-lawyer conference, whether in the privacy of an office or at the counsel table in court, contravenes our sense of traditional fair play and due process and is particularly offensive where defendants have sought to keep their conversations and communications secret and confidential by resort to a foreign language.[3]

---

3. If, of course, the defendant, knowing third persons to be nearby, speaks in such a way as to indicate that he is not interested in keeping private what he says to his lawyer, the defendant himself has made the choice and his statements will not be considered "privileged" or, more precisely, he will be deemed to have renounced his right to privacy of consultation. Not so, however, in a case such as the present, where defendants went to the extreme in seeking to protect themselves from being overheard. The mere presence of people in the courtroom or in the spectators' box does not destroy the right to confer with counsel in private and in confidence and, if defendants take every reasonable precaution to preserve the secrecy of their courtroom communications, they may not be regarded as having consented to forego or waive that right.

To cull from what was said in *Coplon* v. *United States* (*supra,* 191 F. 2d 749, 759, certiorari denied 342 U. S. 926), "The prosecution is not entitled to have a representative present to hear the conversations of accused and counsel."

If, then, defendants — upon whom the burden rested (see *People* v. *Greenfield,* 301 N. Y. 724; *People* v. *Oddo,* 283 App. Div. 497; *People* v. *Barber,* 276 App. Div. 1040) — had proved that Rubin was planted in court with instructions to eavesdrop on conversations between them and their attorneys, a new trial would have been required. (See, e.g., *Matter of Fusco* v. *Moses, supra,* 304 N. Y. 424, 433; *Glasser* v. *United States,* 315 U. S. 60, 76.) That, however, is not this case. Here, as already noted, defendants failed to adduce any substantial evidence that Rubin was present for other than proper and legitimate reasons or that he reported anything said between defendants and their lawyers or even that he heard any such conversations. Even if we were to assume that Rubin was in a position where he could not help but overhear, we could not say that the intrusion was other than unintentional and excusable as a merely incidental result of necessary and reasonable precautions to frustrate any possible attempt to escape. The law " is sedulous in maintaining for a defendant charged with crime whatever forms of procedure are of the essence of an opportunity to defend " (*Snyder* v. *Massachusetts,* 291 U. S. 97, 122), but it does not prevent the stationing of a police officer in the courtroom near defendants and their counsel, if basis for suspicion exists that an attempt to escape may be made.

The judgments of conviction should be affirmed.

DYE and VAN VOORHIS, JJ. (concurring in result). We concur in the decision being made that reargument should be denied and that the judgments of conviction should be affirmed. We find ourselves unable to agree with statements made near the end of the majority opinion, which are not necessary to the decision, that conversations between clients and attorneys conducted in a foreign language in a crowded courtroom, give rise to a confidential status, in the absence of any prior objection addressed to the court that adequate opportunity to confer has been denied during the trial. No privileged communications are recognized between attorney and client which are made in the presence of

third persons who stand in no confidential relationship (*Doheny v. Lacy,* 168 N. Y. 213). Consequently, the presence in the courtroom, close to appellants' desk, of a plain-clothes police officer, however he came to be there, cannot be said to have intercepted by stealth any privileged communications between appellants and their trial counsel. They knew that a stranger was present within earshot, nor could their constitutional rights have been violated due to the mere circumstance that they were unaware that he understood the language in which they were conversing with their attorneys. We do not doubt the constitutional right to the aid of counsel, which includes reasonable opportunity to consult with counsel. If any of these defendants were deprived of that right during the trial on account of police officers or others being in too close proximity to them or to their lawyers, they had the right to object upon the record at the time when they claim that any infringement of their rights occurred, but not to complain for the first time that they were denied privacy in the courtroom after they have been unsuccessful in the trial.

The situation is different from eavesdropping upon private consultation by wire tapping (*Coplon v. United States,* 191 F. 2d 749, certiorari denied 342 U. S. 926), or through the agency of a spy posing as a codefendant (*Matter of Fusco v. Moses,* 304 N. Y. 424). The use of a concealed recording device, instanced in the opinion, would be classifiable with the *Coplon* and *Fusco* cases, and should be condemned in our view also. The situation is different where a third person is present who is not in the confidence of defendants, with the consequence that they are chargeable with knowing that whatever is said to their lawyers in his presence will not be privileged. As the majority opinion states, there is a failure of proof that this plain-clothes officer, Harry Rubin, was placed in this courtroom to overhear consultations between these defendants and their attorneys. We agree with that, and, if the opinion had stopped there, would not have written this concurring memorandum. But we do not wish to be committed to an obiter dictum that, in some other case not now before the court, a new trial would necessarily be required if it were to develop that a communication between a defendant and his attorney were to be overheard, even if it were

reported to the Sheriff or to the District Attorney. Such practices should be condemned, if they occur, the more emphatically if planned in advance; but it is easy for unscrupulous defendants to fabricate such incidents, and it is so difficult to sift the motives of persons who may thus be charged with deliberately engaging in such practices, especially if they themselves become parties to a conspiracy to manufacture such a defense, that it is wiser not to make the granting of a new trial dependent upon the motive instigating the presence of third persons in the courtroom, i.e., whether they have been "planted" there to listen, but to hold in accord with the traditional law that no confidential status exists if a stranger is known to be in the immediate presence of lawyer and client (*Doheny* v. *Lacy, supra*).

The burden would thus be placed upon a defendant of applying to the court to provide opportunity for private consultation during the trial if that right is being infringed.

There is no assertion that appellants were deprived of opportunity to consult with their attorneys outside of the courtroom, nor does the petition set forth that any request was made of the court during the trial to provide appellants with greater privacy in open court. Courtrooms are usually crowded, especially during sensational trials, and, unless an objection of this nature is made at the time, justice is not likely to be served by permitting defendants to keep it secret until after the verdict, and then present it for the first time if the outcome of the trial is adverse and they are convicted.

Lewis, Ch. J., Conway, Desmond and Froessel, JJ., concur with Fuld, J.; Dye and Van Voorhis, JJ., concur in result in a separate memorandum.

Upon reargument: Judgments of conviction affirmed. Questions under the Federal Constitution were presented and necessarily passed upon by this court; viz., as to whether the rights of the defendants to due process under the Fourteenth Amendment to the Federal Constitution were violated in that defendants' claim (1) that they were deprived of their rights to counsel and a fair trial and that such rights were impaired; and (2) that the district attorney used evidence known by him

to be perjured and suppressed material evidence and that defendants were deprived of a hearing on this claim. This court held that there was no denial of any constitutional right of the defendants.

Judgments of conviction affirmed, etc.