People v Hollmond (2020 NY Slip Op 07222)





People v Hollmond


2020 NY Slip Op 07222


Decided on December 2, 2020


Appellate Division, Second Department


Miller, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 2, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

RUTH C. BALKIN, J.P.
CHERYL E. CHAMBERS
ROBERT J. MILLER
ANGELA G. IANNACCI, JJ.


2015-02257
 (Ind. No. 2629/13)

[*1]The People of the State of New York, respondent,
v
Tyron Hollmond, appellant.



APPEAL by the defendant from a judgment of the Supreme Court (Danny K. Chun, J.), rendered December 3, 2014, in Kings County, convicting him of manslaughter in the first degree and attempted murder in the second degree (two counts), upon his plea of guilty, and imposing sentence. By decision and order of this Court dated March 27, 2019, the matter was remitted to the Supreme Court, Kings County, for further proceedings, including a hearing, on the defendant's application to withdraw his plea of guilty and thereafter for the issuance of a report as to the Supreme Court's findings with respect to whether the defendant established his entitlement to withdrawal of his plea. The appeal was held in abeyance pending receipt of the Supreme Court's report (see People v Hollmond, 170 AD3d 1193). The Supreme Court has now filed a report.



Paul Skip Laisure, New York, NY (Lynn W. L. Fahey of counsel), for appellant.
Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove and Morgan J. Dennehy of counsel), for respondent.



MILLER, J.


OPINION & ORDER
A guilty plea must be knowingly and intelligently given and, if it is "to any degree induced by fear or coercion, it will not be permitted to stand" (People v Pearson, 55 AD2d 685, 686). Under the circumstances here, and particularly in view of the defendant's substantiated and uncontradicted testimony that he was deprived of his constitutional right to consult with his attorney in advance of trial, the Supreme Court improvidently exercised its discretion in denying the defendant's application pursuant to CPL 220.60(3) to withdraw his plea of guilty. Under the circumstances and for the reasons that follow, we conclude that the interests of justice would have been better served had the defendant been permitted to withdraw his plea of guilty.
I. Factual and Procedural Background
The defendant was charged, under Indictment No. 4182/12, with attempted murder in the second degree and other related offenses. The defendant was subsequently charged under Indictment No. 2629/13 with, inter alia, murder in the second degree. The crimes charged in the indictments were alleged to have occurred on multiple dates, including on April 22, 2012, and "on or about and between August 1, 2012 and October 1, 2012." The Supreme Court, Kings County (Danny K. Chun, J.), subsequently consolidated the two indictments under Indictment No. 2629/13, to proceed to a single trial.
The defendant was confined, pretrial, based on a prior felony conviction, at Coxsackie Correctional Facility, in Coxsackie, approximately 132 miles north of the Kings County Supreme Court in Brooklyn. At a calendar call on October 6, 2014, before the Supreme Court, Kings County (Betty Williams, J.), the clerk noted for the record that the defendant had "not [been] produced by the Department of Corrections." The clerk explained that the defendant was "still at the upstate correctional facility in Coxsackie." The clerk continued: "[t]he facility is claiming they didn't receive the Order to have the defendant produced."
Defense counsel asked if the court would order the defendant to be "transferred to a facility closer to this Court." Defense counsel stated that it was "very, very difficult" to communicate with the defendant when he was confined in Coxsackie. Defense counsel stated that he would "try to write the warden a letter," but that the situation had been "a continuing saga." After an off-the-record discussion, the court stated that it would "have [its] court attorney try to intercede," and later indicated it would also attempt to make "phone calls." The matter was adjourned until October 31, 2014, "for trial."
On October 31, 2014, the defendant was produced by the Department of Corrections for a calendar call before the Supreme Court, Kings County (Betty Williams, J.). The court stated that the defendant was "going . . . forthwith to Part 19 for trial."
Later on that same date, the defendant appeared in the trial part of the Supreme Court, Kings County (Danny K. Chun, J.). The court stated that the matter had been sent there for trial, and that it would "likely start picking a jury on Monday." The court indicated that it first wanted to address the fact that the defendant was "brought in from Ulster County, and not from Rikers."
Defense counsel stated that the defendant was "being denied his right to consult with counsel." Defense counsel explained that the defendant had been "up in Coxsackie for quite a while" and that the facility did not permit him adequate communication with the defendant. Defense counsel had written "the warden at Coxsackie" and "indicated to him that [the defendant] was being denied his basic constitutional rights, the right to counsel." In response to his letter, defense counsel "got back this convoluted letter, which reflected basically nothing, that they are going to do what they are going to do." Defense counsel noted that the defendant was set to return to a different prison that night, but that "even when he's at the Newton prison . . . it is such a distant area . . . I am unable to consult with [the defendant] on a regular basis."
Defense counsel stated that if the defendant was housed at a facility in the City of New York, he would be able to consult with the defendant in person. Defense counsel emphasized that this was "a very, very serious case." The Supreme Court stated that it would "sign an order directing the Corrections Department to keep the defendant either in Rikers or Brooklyn House . . . during this trial."
Later during the same proceeding, the Supreme Court stated that it was willing to offer the defendant a sentence of 20 years to life in prison if he agreed to plead guilty to murder in the second degree, but the court said it could not "do any better than that." Defense counsel stated that the defendant would not accept the court's offer.
The defendant next appeared before the court on November 3, 2014. The defendant was produced by the Department of Corrections from the Ulster Correctional Facility. The Ulster Correctional Facility, in Napanoch, is approximately 100 miles north of Brooklyn.
Defense counsel stated that the defendant had not been transported to a facility closer to the site of the trial, and that it was his understanding that the defendant "will continue to be housed at Ulster." Defense counsel reiterated that he could not adequately confer with the defendant under such circumstances and set forth the efforts he had made. Defense counsel noted that the response from the Department of Corrections "was very trite" and recommended that defense counsel visit with the defendant in Coxsackie, "a four or five-hour drive" from Brooklyn.
Defense counsel stated that it was also "onerous for [the defendant] to come every morning especially when he's on trial from Ulster, which he did this morning, waking up at 4, 5:00 in the morning then come to court here today without adequate preparation and consultation with his attorney." Defense counsel continued: "the Department of Corrections of the State of New York is violating [the defendant's] constitutional rights to consult with his attorney and to defend this case . . . under the New York and the United States Constitution."
Defense counsel represented that the Department of Corrections had "made no effort" to respond to him or to the Supreme Court's prior directive. When the court asked the People if they had made any efforts to have the defendant transferred to a closer facility, the prosecutor responded that the People had not made any efforts to have the defendant relocated. The prosecutor stated: "I was told Ulster was going to transport him every single day." Defense counsel stated that without consultation with the defendant, he would "not proceed" unless ordered to do so by the court.
After an off-the-record discussion, the Supreme Court stated that it would issue another order, specifically addressed to the Ulster Correctional Facility, directing that the defendant be "sent down to Riker's for the duration of the trial, but before I even do that, I want to visit this possible plea offer one last time." The court then offered the defendant another plea bargain, asking if he would be willing to accept a sentence of 20 years in prison. Defense counsel conveyed that the defendant was not interested in the court's offer. The court stated that it "will not ever approve of a sentence in a case this serious anything less than 20 years." Defense counsel reiterated that the [*2]defendant had no interest in the court's offer. The court adjourned the case until November 6, 2014, "for jury selection."
Three days later, on November 6, 2014, the defendant was produced by the Department of Corrections from the Ulster Correctional Facility. Defense counsel stated that it had been "a continuing saga regarding the defendant's production" and that the defendant continued to be held in Ulster. Defense counsel stated that it had taken the defendant six hours to reach the court that day, and that after these proceedings he would be sent back to Ulster again, which would take another "four to six hours."
The Supreme Court acknowledged that the defendant had been produced "much later" due to "bad driving conditions." It stated that it had "been trying for the last couple of adjournments to get [the defendant] brought down to . . . Riker's or anywhere else." The court stated that it had issued numerous orders, but that "they have not been adhered to." The court continued: "[p]erhaps [the orders] went to the wrong place, the wrong person, but I intend to write directly to the warden at Coxsackie." The court went on to state that, "if all those efforts fail, bottom line is we're going to have to go to trial wherever he is and it will take longer . . . but counsel will have time before we start, he will have time during the lunch break, and he will have time after we break." The court stated that it would proceed that way "[i]f we must," but that it was "going to do everything [it] can do [to] try to move him."
The Supreme Court asked the prosecutor what efforts the People had made to have the defendant moved to a closer facility. The prosecutor stated that the People were "still trying to get him in a facility at Riker's," but that they had been unsuccessful and were "still working on it." The prosecutor went on to say that she had "informed the supervisors that if they don't let him stay at Riker's, they will incur overtime because Your Honor will keep [the defendant] late so that he can speak to his attorney, so hopefully with the idea they will have to do overtime they will keep him at Riker's."
Defense counsel suggested that the prospect of overtime "may induce . . . the correction officers from upstate to continue to have him housed at Ulster." Defense counsel stated that he wanted to make "three objections," but the court told him to "save [his] breath." The Supreme Court asked the prosecutor when the trial could begin and suggested "Monday again to start picking if he's moved." The prosecutor indicated that the date would provide "sufficient time" to have the defendant moved, and the matter was adjourned until November 10, 2014.
On November 10, 2014, the defendant was again produced from the Ulster Correctional Facility. The Supreme Court asked defense counsel to ask the defendant "where exactly he left from this morning." Defense counsel stated that the defendant was "permanently" at Coxsackie, but that "for some reason when they have court dates they put him at Ulster and he stays at Ulster." Defense counsel stated that the defendant "left Ulster between 5:00 and 5:30 this morning" and had "been on the road some five hours."
The Supreme Court stated that "[it] was told that [the defendant] was here around 10:00" but that it had still taken him "close to an hour" to be produced in the courtroom. The court continued: "It's 11:15, but at the earliest defendant could have come up probably around 10:45 or so, and then give [defense counsel] a few minutes, it will be nearly impossible to hold a jury trying the case that way."
The Supreme Court stated that it had sent a letter "to the superintendent of Coxsackie expressing [its] concerns why [its] directives have not been complied with." The court noted that "[t]he administrative judge [was] trying to call the counsel at the Department of Corrections."
The court then addressed the prosecutor, stating "anything you can do to try to remove the defendant would help the situation." The prosecutor represented that she had spoken with a number of "captains," but that "no one has agreed to let [the defendant] stay anywhere at Riker's."
The court stated that it would adjourn the matter and directed defense counsel to amend the date on one of its past orders to "see if that works." The court then asked if there was any possibility of a disposition. The court asked the prosecutor if the People would consent to a plea bargain pursuant to which the defendant would receive a sentence of 18 years in prison. Defense counsel informed the court that the defendant was "not interested in the 18 years at all."
Three days later, on Thursday, November 13, 2014, the defendant was again produced by the Department of Corrections from Ulster. The Supreme Court noted for the record that the defendant arrived "late" and that the prosecutor was not present in the courtroom. The court stated that it was "still attempting to house the defendant at Riker's or a New York City facility if at all possible, and we're trying to do that by Monday."
The Supreme Court stated that the defendant had been given an opportunity to meet with defense counsel "over lunch." The court stated that defense counsel's "biggest concern was that [*3]during the trial he [would] not have sufficient access with his client." The court stated that it was "trying to assuage that situation by giving him as much time, face time as possible today and tomorrow." Defense counsel stated that he had spent "several hours" with the defendant earlier that day. The defendant said the meeting had lasted for "an hour and-a-half."
The Supreme Court set forth its plan for the trial, stating that it "plan[ned] to break sooner than other trials so [defense counsel] will have time at the end of the day . . . before [the defendant] is taken Upstate to speak to him during the trial." The court planned to "finish approximately around 4:00 every day" and indicated that it would not "go until 5:00." The court informed defense counsel: "[t]hat's the plan . . . [and] when the People are here, if you have additional objections you will have a chance to make [them] on the record on Monday." The court was unequivocal, however, in stating "come Monday regardless [of] where he is, we will begin jury selection. The trial will proceed."
The defendant was next produced before the court the following Monday, on November 17, 2014—the date set for the beginning of his trial. The Supreme Court did not inquire where the defendant had been produced from. The defendant's attorney stated that his client would enter a guilty plea to one count of manslaughter in the first degree and two counts of attempted murder in the second degree in exchange for concurrent sentences of 18 years' imprisonment on each count, plus five years of postrelease supervision. The court immediately began to conduct the plea colloquy, advising the defendant, at one point, that there was "a jury pool downstairs" and that if the defendant did not wish to plead guilty, the court could "bring up the jury pool and start jury selection and start this trial." After describing the terms of the plea agreement, the court conducted the following colloquy:
"THE COURT: Has anybody promised you anything different, or anything other than what I just told you about [the] sentence, to make you plead guilty?
THE DEFENDANT: No, sir.
THE COURT: Is anybody forcing you or pressuring or coercing you to plead guilty?
THE DEFENDANT: No, sir.
THE COURT: Are you pleading guilty voluntarily, of your own free will?
THE DEFENDANT: Yes, sir."
After the defendant's guilty plea was accepted, the court advised the defendant that he was also "being asked to waive [his] right to appeal, which means that if you're sentenced as promised, you will not be able to appeal this conviction, that this would be final." After the defendant purportedly waived his right to appeal, the matter was adjourned for sentencing.
About two weeks later, on December 3, 2014, the defendant appeared before the Supreme Court, Kings County (Danny K. Chun, J.), for sentencing. Defense counsel immediately alerted the court that the defendant wanted to "take his plea back." When the court asked defense counsel why the defendant wanted to withdraw his plea, the defendant was permitted to address the court: "on numerous occasions [defense counsel] stated on the record that he refused to proceed with this case due to the lack of attorney/client visitations and trial was still pushed on me which I feared due process." The defendant stated that he felt that defense counsel "couldn't represent [him] . . . due to the lack of knowledge and understanding to this matter." The defendant stated that his attorney had indicated that he thought that the defendant was guilty, and "advised [the defendant] strongly to take this plea." The defendant asked the court to appoint him a new attorney and allow him to proceed to trial. Defense counsel urged the court to appoint a new attorney to represent the defendant in light of his application.
The Supreme Court summarily rejected the defendant's application without appointing new counsel and before the People even took a position on the defendant's application. Citing to the terms of the plea agreement, the court stated that the defendant's argument that defense counsel had not adequately represented him was "absolutely inaccurate and incorrect." The court [*4]stated that it had "no reason to [think] that defendant entered into a plea involuntarily or he was tricked into taking a plea or he was forced to take a plea." The court stated that it saw "no legal reason" why the sentence could not be imposed. The court proceeded to sentence the defendant to concurrent determinate terms of 18 years' imprisonment plus five years of postrelease supervision on each of the three convictions.
The defendant appealed from the judgment of conviction. On appeal, the defendant contended, inter alia, that the Supreme Court should have granted his application to withdraw his plea. The People asserted that the defendant failed to preserve his contention that his plea was not voluntary. The People further argued that this Court should not review the defendant's contention in the interest of justice because that claim was "speculative and unsupported." On the merits, the People asserted that the record demonstrated that the defendant's plea was voluntary.
By decision and order dated March 27, 2019, this Court recognized that "[t]he record substantiates the defendant's claim that his plea was effectively coerced by the ongoing violation of his Sixth Amendment right to counsel and, thus, a genuine factual issue as to the voluntariness of the plea existed that could only be resolved after a hearing" (People v Hollmond, 170 AD3d 1193, 1195). This Court determined that the Supreme Court "should have conducted a hearing to explore the defendant's allegations in order to make an informed determination" (id.). Accordingly, this Court remitted the matter "to the Supreme Court, Kings County, for further proceedings, including a hearing, on the defendant's application to withdraw his plea of guilty, for which the defendant should be appointed new counsel" (id.). This Court directed that the appeal be held "in abeyance pending receipt of the Supreme Court's report" (id.). This Court expressed "no opinion as to the merits of the defendant's application" and "decide[d] no other issues at th[at] time" (id.).
On remittitur, the Supreme Court, Kings County (Danny K. Chun, J.), appointed the defendant new counsel, and held a hearing over the course of several days. At the hearing, the defendant testified on his own behalf. The People presented the testimony of an officer employed by the New York State Department of Corrections, and an officer employed by the New York City Department of Corrections.
The defendant testified that when his case went to trial posture in October 2014, he was transferred to Ulster Correctional Facility. The defendant was brought down from Ulster Correctional Facility for each court date. He was never housed at Rikers Island or any other facility within New York City.
The defendant was asked to describe a "typical" transfer from the prison in Ulster to the Kings County courthouse. The defendant said he was awakened at about 3:00 a.m. on days that he was scheduled to appear in court. He was not provided with breakfast or medical care, although he had been prescribed certain medications to treat his asthma, and for his mental health.
The defendant was typically transported from Ulster to the "Downstate" Correctional Facility, located in Beacon, at about 6:30 or 7:00 a.m. The trip from Ulster to Beacon would take about two hours. The defendant was transported in "the back of a van." The defendant was placed in an all-metal cage in the back of the van. The cage was referred to as "the dog cage." This name was used because it was "a metal cage where you would put a K-9 in." The defendant was placed in the cage "handcuffed and shackled." There was no car seat in the cage, only "a metal bench." The defendant testified that the cage was "very, very small" and that he could not sit in it unless he was "sideways." The defendant stated that he was unable to sleep in the cage, and he described the physical discomfort and injuries that he sustained while being transported in that manner.
Once the defendant arrived at the Beacon facility, his handcuffs and shackles were removed and he was placed "in the bullpen." The defendant was not provided with any food at that facility. He was given the opportunity to use a toilet and he would get dressed for court while he waited for transportation to Brooklyn.
When the transport arrived, he was handcuffed and shackled and placed into another "identical" van with the "same . . . cage." It typically took the defendant three or four hours to get to the courthouse in Brooklyn from the Downstate facility in Beacon. His total travel time from Ulster to Brooklyn typically took about five hours.
The defendant was not provided with any food at the courthouse until there was a lunch break, usually around 1:00 p.m. For lunch at the courthouse, the defendant would receive a "peanut butter and jelly sandwich." This was typically the first time that the defendant would receive any food on dates that he was to appear in court.
The defendant stated that after a court appearance, he would "go back to the pen until around 5:30, 6:00." The defendant was transported back to the Downstate facility in Beacon in the same type of van, with the same type of "dog cage" in the back. The defendant was handcuffed and shackled during his return trip. Once at the Downstate prison, he waited to be transported back to [*5]the Ulster prison. Once he was transported to Ulster, he went through a security search and was processed "through medical." The defendant testified that he would typically get back to his cell at about midnight. The defendant was not provided with a hot dinner or any other food when he returned to Ulster that late. He was able to eat food that he had purchased through the "commissary" at that time, typically a "bag of chips, pack of tuna." If he had court the next day, he would be woken up about three hours later, at about 3:00 a.m., to get ready for his transport.
The defendant was aware that his attorney in 2014 had made several efforts to have him transferred from Ulster to Rikers for the duration of the trial. The defendant was also aware that the court had made several efforts to have him moved. However, it was made clear to the defendant that on Monday, November 17, 2014, the trial was going to proceed regardless of where he was confined. When he arrived at court on that date, he was still being held in Ulster. The defendant was never housed at Rikers Island. It was apparent to the defendant that the case was going to trial, regardless of where he was held. At that point, the defendant accepted the plea offer of 18 years in prison because he did not have enough time to "consult with [his] lawyer" and because his lawyer "wasn't ready for trial and they [were] forcing [him] to trial anyway." The defendant testified that the "[s]tress, duress [and] physical hurt" that resulted from the methods and timing of his daily transportation schedule also played a role in his decision to plead guilty.
The defendant recalled accepting the plea offer on November 17, 2014. On the next court date, he sought to withdraw his plea. The defendant understood that if his plea was vacated, he would be facing the possibility of consecutive sentences, and significantly more prison time if he were convicted after a trial.
On cross-examination, the defendant testified that, on some dates before the case went into the trial part, he would stay at the Downstate facility for several days after a court appearance, before eventually returning to the Coxsackie Correction Facility. The defendant agreed that at the November 3, 2014, court appearance, his attorney said that the defendant had been woken up at the Ulster Correctional Facility at 4:00 or 5:00 a.m. that morning.
The defendant testified that he was "familiar with pleading guilty" as he had done so on approximately 10 previous occasions. The defendant testified that he had sometimes pleaded guilty in the past, even though he was not actually guilty. When the Supreme Court asked the defendant "why did you plead guilty when you were innocent?", the defendant replied: "Because I'm not naive to the system, sir. Sometimes I know people get found guilty and they [are] innocent. People get found guilty and do a lot of time and they [are] innocent. Central Park five." The defendant had never before asked to withdraw a guilty plea.
Upon questioning by the Supreme Court, the defendant admitted that he was not telling the truth when he spoke to the court during the colloquy at the plea proceeding on November 17, 2014. When the court asked the defendant "[i]s there any particular reason why you were not being truthful that day?", the defendant answered: "My lawyer said if you don't take the plea, you go to trial and we are not properly prepared and I blow [the] trial, I get a whole, whole lot of time." The defendant stated that he "pled guilty here because [he] was under stress and duress and [he hadn't] been able to consult with [his] lawyer." The defendant continued: "Your Honor said that the trial was going on, regardless of whether we [were] able to consult or not, that's why I pled guilty."
Lieutenant Jason Callender was called to testify by the People. He was employed by the New York State Department of Corrections, where he had worked for over 24 years. He worked at the Ulster Correctional Facility, and his duties were "transportation and inmate disciplin[e]." He had held that position for "[a]pproximately a month."
In 2014, Lieutenant Callender worked at the Ulster Correctional Facility. At that time, "[he] did staffing, medical information for officers, and [he] was also doing the inmate disciplinary program."
Lieutenant Callender testified that he was familiar with the transportation of prisoners from Ulster to "a courthouse down in the city." In October and November 2014, inmates who were to be transported would be woken up sometime before Lieutenant Callender began his shift at 5:00 a.m.
The "midnight tour" was responsible for waking up the prisoners. Lieutenant Callender's "tour" would then escort the inmates to the "draft building" where they were "stripped first," then "searched" and "put into court clothes." Lieutenant Callender testified that it was "standard practice" to "feed them breakfast" at the draft department. The inmates were held in that location until "the Rikers [van] came up to pick them up, or county came to pick up for the courts."
The New York State Department of Corrections was not responsible for providing transportation to Rikers Island. The New York State Department of Corrections had a number of vehicles that it used when transporting prisoners from Ulster to other state facilities, including a van, [*6]a mini bus that holds 20 inmates, and bigger buses that can hold approximately 44 inmates.
Lieutenant Callender testified on cross-examination that he did not recognize the defendant and did not have any personal involvement in the defendant's transportation in 2014. He had no independent information as to when the defendant had actually left Ulster in October or November 2014. He had no personal information as to the vehicle used to transport the defendant in 2014.
The van used by the New York State Department of Corrections had seats "in the front for the officer[s]" and in the back, behind a "shield," there was "the cage." Lieutenant Callender had never heard the cage referred to as a "dog cage." Inmates were shackled inside the van, and they sat on "factory" "benches" that "come with the van."
Captain Leon Britton was also called by the People to testify at the hearing on remittitur. He had been employed by the New York City Department of Corrections for 29 years. His current position was "State Captain for transportation." In that capacity, his duties included overseeing the transportation of inmates "to and from state facilit[ies]."
Captain Britton was asked about the procedure used in 2014 to transport inmates from the state facilities in Ulster to the courthouse in Brooklyn. One team of officers would be assigned "for Ulster [and] one for Downstate." These teams would "come at 4 o'clock in the morning, go straight to that facility, get the inmates who are on the calendar for court." They would usually arrive at Ulster or Downstate at "approximately six, after 6:00 a.m." Captain Britton testified that this general transportation procedure would have been used on the days that the defendant appeared in court on October 31, 2014, November 3, 2014, November 6, 2014, November 10, 2014, November 13, 2014, and November 17, 2014.
The defendant's infraction history was admitted into evidence at the hearing without objection. Captain Britton testified that it reflected that the defendant had been cited for "harassing staff" on December 4, 2007, and for "assaulting staff" on March 9, 2008, and May 19, 2008. The defendant was cited for a "positive urinalysis" on November 7, 2012, and cited for "tampering with urine" on January 8, 2013. The exhibit reflected that the defendant was found "guilty" of all of the administrative infractions cited.
Captain Britton testified that he did not have access to the infraction history records in connection with his day-to-day duties. The "Office of Special Investigation Unit" (hereinafter the OSIU) would review such records. The OSIU was responsible for making the determination as to where an inmate would be housed prior to trial. Over the defendant's objection, Captain Britton opined that, given the defendant's infraction history, the OSIU would have determined that the defendant would be "transport[ed] back and forth" each day from a facility upstate to the courthouse in Brooklyn.
The New York City Department of Corrections assigned the defendant a classification score of 28, which took into account the defendant's criminal and disciplinary history. Captain Britton stated that 28 was a "high" score. In light of that score, the defendant would have been placed "in a cage by himself" if he was transported in a van.
On cross-examination, Captain Britton testified that Rikers Island was able to house inmates charged with murder and inmates with high classification scores. Captain Britton did not have any information or records that pertained to the decision to house the defendant upstate during his trial in Brooklyn.
After the hearing testimony, defense counsel, and the People, made oral arguments. On January 8, 2020, the Supreme Court issued a report in accordance with this Court's directive. The Supreme Court made factual findings, in which it apparently credited the bulk of the defendant's testimony. The court also appeared to credit the testimony of the People's witnesses, whose testimonies were largely consistent with the defendant's account. However, the court was clear that it "[did] not credit the defendant's testimony that he pleaded guilty only because he did not have sufficient time to speak to his lawyer."
In reaching this conclusion, the Supreme Court cited to the colloquy at the plea proceeding, during which the defendant acknowledged, among other things, "that he had not been promised anything to make him plead guilty" and "that he was not forced, pressured or coerced to plead guilty." The court found that the defendant "clearly answered that he was pleading guilty voluntarily of his own free will" and he "did not object to the sentence [the] court was promising." The court concluded that "[i]t clearly was the defendant's decision to enter into a guilty plea" and he "unequivocally demonstrated that he was fully aware of the plea proceeding and the implications of his guilty plea."
The Supreme Court further concluded, that "the record is clear that on Thursday, November 13, 2014 and Friday, November 14, 2014 . . . the defendant had sufficient time to consult [*7]with his attorney." The court continued:
"On Thursday, the defendant spoke with his lawyer for 'a few hours' and on Friday, the defendant was produced to court solely to speak to his lawyer. Therefore, this court is not convinced by the defendant's argument that he did not have sufficient time to consult with his lawyer prior to taking the plea. In addition, the defendant was not brought to court on weekends and therefore, did not have to get up early in the mornings. Therefore, the defendant's argument that he could not function on the Monday he took the plea because of his court schedule is not convincing either."
The Supreme Court went on to state that it had "made it clear that in the event that the defendant was not housed in New York City during the trial, [it] would start the trial later in the morning and end the trial earlier in the afternoon in order to give the defendant time to consult with his lawyer." "[A]t no point did [it] force or compel the defendant and his attorney to start trial when there was an issue with production." The court concluded that "the defendant's argument that his counsel forced him to take the plea because he did not have enough time to speak to the defendant [was] without merit." The court ultimately denied the defendant's application pursuant to CPL 220.60(3) to withdraw his plea. We reverse.
II. Discussion
New York, like most other jurisdictions, has long accepted the practice of plea bargaining, noting that it "serves important functions for both prosecutors and defendants" (Matter of Hynes v Tomei, 92 NY2d 613, 624-625, cert denied 527 US 1015; see People v Grant, 61 AD3d 177, 182). "Indeed, plea bargaining is predicated on mutuality of advantage" (People v Grant, 61 AD3d at 182-183; see Brady v United States, 397 US 742, 752; People v Seaberg, 74 NY2d 1, 7).
"In return for surrendering the right to put the prosecution to its proof at a trial and for giving up the possibility of acquittal, the defendant receives consideration, almost always in the form of a sentence more lenient than might reasonably be expected upon a conviction after trial" (People v Grant, 61 AD3d at 183; see People v Pena, 50 NY2d 400, 412). "And, in return for agreeing to the more lenient sentence, the prosecution obtains the certainty of conviction and punishment without having to expose witnesses to the rigors of trial or to establish the defendant's guilt to a jury's satisfaction beyond a reasonable doubt" (People v Grant, 61 AD3d at 183; see People v Selikoff, 35 NY2d 227, 233).
"Unlike a verdict, which must necessarily be based exclusively on the evidence submitted at trial, a defendant's decision to plead guilty may be based on any factor inside or outside the record" (People v Grant, 45 NY2d 366, 379). "[A] decision to plead guilty is one of the most solemn and personal rights that a person has" and, regardless of his or her underlying motivations, the decision is "[the defendant's] alone to make" (People v Rolston, 66 AD2d 617, 628, affd 50 NY2d 1048).
"[I]n order to be valid and enforceable, a guilty plea must be entered voluntarily, knowingly and intelligently" (People v Brown, 14 NY3d 113, 116). "A guilty plea is voluntary only if it represents an informed choice freely made by defendant among other valid alternatives" (id.; see North Carolina v Alford, 400 US 25, 31; People v Grant, 61 AD3d at 182).
Even after a defendant pleads guilty, the Criminal Procedure Law provides that "[a]t any time before the imposition of sentence, the court in its discretion may permit a defendant who has entered a plea of guilty . . . to withdraw such plea, and in such event the entire indictment, as it existed at the time of such plea, is restored" (CPL 220.60[3]).
"The decision as to whether to permit a defendant to withdraw a previously entered plea of guilty rests within the sound discretion of the court and generally will not be disturbed absent an improvident exercise of discretion" (People v Jacob, 94 AD3d 1142, 1143; see People v Alexander, 97 NY2d 482, 485). In general, "such a motion must be premised upon some evidence of possible innocence or of fraud, mistake, coercion or involuntariness in the taking of the plea" (People v De Jesus, 199 AD2d 529, 530; see People v Nettles, 30 NY2d 841, 841-842; People v Englese, 7 NY2d 83, 87; People v Haffiz, 77 AD3d 767, 768, affd 19 NY3d 883; People v Smith, 54 AD3d 879, 880).
As relevant here, a guilty plea may be vacated on the ground that it was "coerced, either by actual physical compulsion, threats and the like or 'by the duress of circumstances'" (People v White, 32 NY2d 393, 399, quoting People v Flowers, 30 NY2d 315, 317). Of course, bare and unsubstantiated claims of coercion or duress, without more, are insufficient to warrant vacatur of a guilty plea (see e.g. People v Henderson, 145 AD3d 1554, 1554-1555; People v Nash, 288 [*8]AD2d 937; People v Hanley, 255 AD2d 837, 838; see also People v Fisher, 28 NY3d 717, 726). However, vacatur may be warranted where the record substantiates a defendant's claim that a guilty plea was motivated, at least in part, by some unduly coercive circumstance (see People v Flowers, 30 NY2d at 318-319; People v Grant, 61 AD3d at 183-184; People v Griffin, 77 AD2d 666).
In deciding whether to grant a defendant's motion to withdraw a guilty plea, additional factors may be relevant. For instance, the time that has elapsed between the guilty plea and the motion to vacate it has been described as a "significant" factor (People v Nixon, 21 NY2d 338, 355). In addition, a court should consider the prejudice, if any, that would result to the People if the motion to withdraw the plea is granted (see People v Leslie, 98 AD2d 977; People v Griffin, 77 AD2d 666; People v Arcuri, 64 AD2d 1028, 1028-1029; People v McIntyre, 40 AD2d 1038; People v East, 39 AD2d 606).
In this case, the defendant contends that he was not provided with an adequate opportunity to consult with his attorney due to the circumstances of his confinement at an upstate facility prior to trial and that, as a result, his attorney was not prepared to try the case. The defendant testified that he felt compelled to plead guilty because the trial was set to commence on Monday, November 17, 2014, regardless of whether his attorney was prepared and notwithstanding the challenges posed by the daily transportation schedule that was utilized by the Department of Corrections.
The Court of Appeals has long recognized that the deprivation of a fundamental constitutional right may effectively compel a defendant to plead guilty "out of necessity" (People v Seaberg, 74 NY2d at 9), in order to avoid the risk of "a trial that is unfair" (People v Blakley, 34 NY2d 311, 315). A guilty plea that is obtained under such circumstances must be vacated (id. at 315).
As relevant here, "[t]he right to counsel . . . is inherent in the concept of a fair trial" (People v Cooper, 307 NY 253, 259). It is protected "under both the Federal and State Constitutions" (People v Koch, 299 NY 378, 381; see US Const 6th Amend; NY Const, Art I, § 6). To give the right to counsel "life and effect," a defendant must be afforded "a private interview with . . . counsel prior to the trial" (People ex rel. Burgess v Risley, 66 How Prac 67, 68; see People v McLaughlin, 291 NY 480, 482-483). The fundamental right to counsel "is denied to a defendant unless [the defendant] gets reasonable time and a fair opportunity . . . to prepare for trial" with "counsel's assistance" (People v McLaughlin, 291 NY at 482-483). "It is well settled that [this] fundamental right . . . includes 'the right to consult counsel in private, without fear or danger that the People . . . will have access to what has been said'" (People v Gamble, 18 NY3d 386, 396, quoting People v Cooper, 307 NY at 259). The right to counsel, "based as it is on a fundamental principle of justice, must be protected by the trial judge" (People v McLaughlin, 291 NY at 482), "'not . . . as a mere matter of rote, but with sound and advised discretion, . . . and with a caution increasing in degree as the offenses dealt with increase in gravity'" (Glasser v United States, 315 US 60, 71, quoting Patton v United States, 281 US 276, 312-313).
In this case, the record demonstrates that the Supreme Court undertook numerous efforts to protect the defendant's fundamental right to consult with his attorney. Indeed, in addition to other efforts, the record shows that Justice Chun himself issued numerous orders directing that the defendant be transferred. The court's own actions in this case thus underscore the gravity and urgency of the defendant's allegations.
While the record demonstrates the Supreme Court's commitment to protecting the defendant's constitutional rights, the court's orders were either refused or ignored by the Department of Corrections, without explanation. Although the Department of Corrections might have had administrative reasons for its intransigence, the defendant's constitutional right to counsel may not be extinguished by administrative fiat. We note that the court here took no steps to enforce the various orders it issued, and it declined to exercise the full scope of its authority (see Judiciary Law article 19). In any event, we cannot say, on this record, that the court was ultimately successful in protecting the defendant's right to counsel.
As an initial matter, it is appropriate to emphasize the correct legal standard in this case, as the Supreme Court's report indicates confusion on this point. As previously indicated, the court ultimately stated that it "[did] not credit the defendant's testimony that he pleaded guilty only because he did not have sufficient time to speak to his lawyer" (emphasis added).
The Supreme Court's characterization of the defendant's testimony is inaccurate, as he never testified to that effect, but rather, cited to other factors that played a role in his decision to accept the plea bargain. In any event, the Court of Appeals has clarified that "[a] guilty plea may not stand, even if only in part it was indisputably motivated by [some undue cause]" (People v Flowers, 30 NY2d at 319 [emphasis added]). Accordingly, "[i]t is immaterial that the hearing court did not [*9]believe that the alleged [coercion] was the only motivation for the plea" (id.). Rather, "as a matter of law, [a] plea is tainted if it appears on the uncontradicted evidence that it was motivated in part by [some undue cause]" (id. [emphasis added]).
The defendant's testimony at the hearing was largely uncontradicted. To be sure, the People presented evidence that prisoners were generally offered breakfast in the morning, and testimony about estimated travel times varied somewhat, but the People's witnesses otherwise largely confirmed the defendant's account of the methods and timing of his daily transportation schedule. Neither of the People's witnesses was actually involved in transporting the defendant during the relevant times, and neither had any personal knowledge about the defendant's case. Furthermore, the People presented no evidence at the hearing to contradict the defendant's central claim that the conditions of his confinement and transportation deprived him of meaningful access to his attorney in the time leading up to the trial.
This basic contention, uncontradicted by the People, was amply supported by the contemporaneous record of the proceedings that occurred in the weeks leading up to the defendant's plea. Indeed, as this Court has already recognized, "[t]he record substantiates the defendant's claim that his plea was effectively coerced by the ongoing violation of his Sixth Amendment right to counsel" (People v Hollmond, 170 AD3d at 1195).
The defendant's testimony at the hearing on remittitur further confirmed that he accepted the plea offer of 18 years in prison because he did not have enough time to "consult with [his] lawyer" and because his lawyer "wasn't ready for trial and they [were] forcing [him] to trial anyway." The defendant testified that the "[s]tress, duress [and] physical hurt" that resulted from the methods and timing of his daily transportation schedule also played a role in his decision to plead guilty.
The Supreme Court nevertheless rejected the defendant's testimony that he did not have sufficient time to consult with his lawyer before taking the plea. In reaching this conclusion, the court stated "the record is clear that on Thursday, November 13, 2014 . . . the defendant spoke with his lawyer for 'a few hours' and on Friday [November 14, 2014], the defendant was produced to court solely to speak to his lawyer." The court did not find, and it was not alleged by the People, that the defendant had any other opportunity to consult with his attorney on this case.
The record supports the Supreme Court's finding that the defendant was given some time to consult with his attorney on Thursday, November 13, 2014. The transcript of the proceedings on that day includes a statement by defense counsel that he had spent "several hours" with the defendant earlier that day. The defendant said the meeting lasted for "an hour and-a-half."
However, although the Supreme Court stated on November 13, 2014, that it was "trying to assuage that situation by giving [the defendant] as much . . . face time as possible today and tomorrow," there is no confirmation in the record that the defendant was actually afforded time to meet with his attorney on Friday, November 14, 2014. No transcript for that date was included in the record on appeal, there was no testimony elicited to that effect at the hearing on remittitur, and the court's record of the defendant's appearances fails to reflect that the defendant was actually produced on that date. In its report, the Supreme Court did not claim personal knowledge of any meeting between the defendant and defense counsel on November 14, 2014, and it did not purport to take judicial notice of any records or court documents. Notably, the court failed to specify how long the defendant was supposed to have met with his attorney on that date.
There is no reason to doubt that the Supreme Court intended to have the defendant transported to the courthouse on Friday, November 14, 2014, in order to afford him time to meet with his attorney. However, given that the court's orders were routinely ignored by the Department of Corrections in this case, there is no reason to assume that the court's intention was actually effectuated, even if it was eventually committed to a written order. Absent such an assumption, there is nothing in the record to support the finding that the defendant had an opportunity to consult with his attorney on November 14, 2014. Accordingly, under the circumstances, we decline to adopt the court's factual finding that the defendant "was produced to court solely to speak to his lawyer" for some unspecified amount of time on Friday, November 14, 2014.
The Supreme Court did not find that the defendant had any other opportunity to meet with his attorney to prepare for this trial, and it cited no other evidence to contradict the defendant's testimony that he had not been given adequate time to consult with his attorney. In sum, contrary to the court's conclusion, "the record does not establish that there must have been adequate consultation between lawyer and client" (People v Nixon, 21 NY2d at 351).
Instead of citing to evidence showing that the defendant's constitutional right to counsel had been adequately safeguarded, the Supreme Court, like the People at the hearing on remittitur, relied heavily on the transcript of the plea proceeding. In this regard, the court cited to [*10]an instance in the colloquy where the defendant generally acknowledged, among other things, "that he had not been promised anything to make him plead guilty" and "that he was not forced, pressured or coerced to plead guilty." Notably, however, despite the pretrial history of this case, the court never asked the defendant if he had been given enough time to consult with his attorney—a fairly standard inquiry at any plea colloquy, let alone one where access to counsel was an ongoing issue at every previous court appearance.
The Supreme Court, again relying on the transcript of the plea proceedings, went on to conclude that "[i]t clearly was the defendant's decision to enter into a guilty plea" and he "unequivocally demonstrated that he was fully aware of the plea proceeding and the implications of his guilty plea." The court noted that "the defendant was not brought to court on weekends and therefore, did not have to get up early in the mornings." Accordingly, the court concluded that "the defendant's argument that he could not function on the Monday he took the plea because of his court schedule is not convincing."
The Supreme Court's characterization of the defendant's argument evinces a basic misapprehension of his claims. At no point did the defendant seek to withdraw his plea on the ground that he was unable to understand what transpired at that court appearance. Rather, the defendant unequivocally testified at the hearing on remittitur that he fully understood the plea bargain. He simply felt compelled to accept it because he had not been given an adequate opportunity to consult with his attorney and he was not prepared to go to trial.
The rote colloquy that occurred at the defendant's plea proceeding, which was before this Court prior to the hearing on remittitur, should be accorded comparatively little weight in the context of the entire record. "The pleading took place in one of the busiest criminal courts in the land, a circumstance requiring more, not less, care by the pleading . . . court" (People v Nixon, 21 NY2d at 350-351). However, at the plea proceeding in this case, the Supreme Court never made any genuine inquiry into whether the defendant had been given adequate time to consult with his attorney and prepare for trial. The inexplicable failure to meaningfully address the central ongoing issue in this case undermines the significance of the handful of generalized responses during the plea colloquy that were relied upon by the court in denying the defendant's application.
The defendant also provided an explanation for his inconsistent statements at the plea proceeding, stating that if he did not take the plea bargain, he would have been forced to "go to trial" even though he and his attorney were "not properly prepared." In this respect, the defendant's explanation is not particularly unique. We have already observed that the deprivation of a fundamental constitutional right may unduly coerce a defendant to plead guilty "out of necessity" (People v Seaberg, 74 NY2d at 9), in order to avoid the risk of "a trial that is unfair" (People v Blakley, 34 NY2d at 315). Under such circumstances, "there is reason to suspect that many pleading defendants are prepared to give the categorical answers only because they know that this is the route to eligibility for the . . . plea [bargain]" (People v Nixon, 21 NY2d at 355). The defendant's testimony in this case is consistent with the practical realities acknowledged in these past cases.
The defendant's explanation at the hearing on remittitur was also consistent with his conduct during the pre-plea proceedings. In the weeks leading up to the eventual plea bargain, the defendant consistently and routinely rejected the plea offers that were advanced by the Supreme Court and the People at nearly every court appearance. Most significantly, the defendant specifically rejected an offer of 18 years' imprisonment at a time when the court still held out the prospect of transferring the defendant to a closer facility so that he could consult with his attorney. At that point, defense counsel informed the court that the defendant was "not interested in the 18 years at all." It was only after the court unequivocally informed the defendant and his counsel that the trial would begin on Monday, November 17, 2014, regardless of the circumstances of his confinement, that the defendant agreed to accept the same sentence that he had explicitly rejected just one week earlier.
In addition, although it was not cited by the Supreme Court in its analysis, the timing of the defendant's application to withdraw his plea was itself "a significant factor to be considered" (People v Nixon, 21 NY2d at 355). The Court of Appeals has indicated, on a number of occasions, that "where initial inquiry exposes difficulties or subsequent interpositions by defendant on sentencing raise questions, the court should be quick to offer the defendant an opportunity to withdraw his plea" (People v Nixon, 21 NY2d at 355; see People v McClain, 32 NY2d 697, 697-698; People v McKennion, 27 NY2d 671, 672-673).
Here, the defendant made the application to withdraw his plea at the beginning of the very next appearance before the Supreme Court about two weeks after he pleaded guilty and before the sentence was imposed. The prompt timing of the defendant's application weighed heavily in his favor. This was not a case where the defendant's claims of coercion were belatedly raised (cf. People v Henderson, 145 AD3d at 1554-1555; People v Nash, 288 AD2d 937; People v Hanley, 255 AD2d [*11]at 838). In addition, the People failed to allege, let alone demonstrate, any prejudice that would have befallen them had the court permitted the defendant to withdraw his plea prior to sentencing (see People v Leslie, 98 AD2d 977; People v Arcuri, 64 AD2d at 1028-1029; People v McIntyre, 40 AD2d 1038; People v East, 39 AD2d 606).
III. Conclusion
This Court has recognized that "[s]imple justice . . . mandates that a plea must be knowingly and intelligently given and, if it be to any degree induced by fear or coercion, it will not be permitted to stand" (People v Pearson, 55 AD2d 685, 686). Under the circumstances here, and particularly in view of the defendant's substantiated and uncontradicted testimony that he was deprived of his constitutional right to consult with his attorney in advance of trial, the Supreme Court improvidently exercised its discretion in denying the defendant's application pursuant to CPL 220.60(3) to withdraw his plea of guilty (see People v De Jesus, 199 AD2d at 531; People v Paulk, 142 AD2d 754, 754-755; People v Leslie, 98 AD2d 977; People v Arcuri, 64 AD2d at 1028-1029; People v McIntyre, 40 AD2d 1038; People v East, 39 AD2d 606; cf. People v Flowers, 30 NY2d at 318-319; People v Grant, 61 AD3d at 183-184; People v Griffin, 77 AD2d 666). In our view, "the interests of justice would have been better served had he been permitted to withdraw his guilty plea" (People v Arcuri, 64 AD2d at 1029; see People v Outlaw, 73 AD2d 677). Accordingly, the defendant's application to withdraw his plea is granted, the guilty plea is vacated, and the matter is remitted to the Supreme Court, Kings County, for further proceedings on the indictment. Under the particular circumstances of this case, we deem it appropriate to direct that such proceedings take place before a different Justice.
In light of the foregoing, we need not address the parties' remaining contentions.
BALKIN, J.P., CHAMBERS, and IANNACCI, JJ., concur.
ORDERED that the judgment is reversed, on the law, the facts, and as a matter of discretion in the interest of justice, the defendant's application to withdraw his plea is granted, the guilty plea is vacated, and the matter is remitted to the Supreme Court, Kings County, for further proceedings on the indictment before a different Justice.
ENTER:
Aprilanne Agostino
Clerk of the Court